# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**T-MOBILE SOUTH LLC,**

  **Plaintiff,**

v.                Case No: 6:18-cv-1161-Orl-31TBS

**MELBOURNE OCEAN CLUB**
**CONDOMINIUM ASSOCIATION, INC.,**

  **Defendant.**

## ORDER

This Matter comes before the Court on the Motion for Preliminary Injunction (Doc. 3) filed by T-Mobile South LLC ("T-Mobile") and the Response (Doc. 14) filed by Melbourne Ocean Club Condominium Association, Inc. ("MOCCA"). The Court held a hearing on the matter on August 9, 2018.

### I. Background

This case involves a controversy over a T-Mobile owned and operated communications facility located on the roof of MOCCA, a beachfront hotel located in Melbourne, Florida. T-Mobile is the lessee under a lease agreement that permits T-Mobile to use portions of the hotel premises, primarily the rooftop, to install, replace, remove, and "maintain a communications facility that consists of assorted telecommunications equipment, including radio transmitting and receiving antennas, radio equipment cabinets, and related cables and utility lines." Doc. 1 ¶ 3. According to T-Mobile, it "has repeatedly sought and been denied access to the Premises to perform the necessary and required emergency repairs" since June 29, 2018. Doc. 1 ¶ 8. On July 11, 2018, Nicholas

Telemachos of Kokina, LLC[1] sent T-Mobile a letter[2] addressed to Carole Bradley, a Senior Manager for T-Mobile, requesting that, within four days: (1) T-Mobile remove unused cables and equipment; (2) T-Mobile remove or elevate connected cables in order to permit work on the existing roof; and (3) T-Mobile remove the generator hook-up equipment to the meter powering the equipment. Doc. 9-2.

There are three points of contention that became apparent at the hearing held on August 9, 2018: (1) T-Mobile's power switches being turned off repeatedly and padlocks securing those switches being severed by an unknown person; (2) T-Mobile being prohibited from meaningful access to the roof to make necessary repairs to its communication facility; and (3) the need to remove or elevate T-Mobile equipment, currently located on the rooftop of the premises, in order for MOCCA to complete roof repairs.

## II. Legal Standards

In determining whether preliminary injunctive relief is merited, the district court must consider whether the movant has established: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005) (citations omitted).

---

[1] According to MOCCA, Kokina, LLC is the property management company and operator. The Complaint claims MOCCA sent the letter, but the letter itself purports to be sent by Kokina, LLC. Mr. Telemachos is the sole-shareholder of Kokina. Doc. 20-1 ¶ 6.

[2] T-Mobile ultimately filed the letter as an "omitted exhibit" on July 27, 2018. The Complaint was filed on July 19, 2018, and the Motion for Preliminary Injunction was filed on July 23, 2018.

### III. T-Mobile's Power Switches

T-Mobile claims that, on or about June 29, 2018, the power to the communications facility was "intentionally shut off," and that afterwards, MOCCA "denied T-Mobile personnel access [to] the premises to make emergency repairs to restore the functionality of the [c]ommunications [f]acility." *Id.* ¶ 5. After the June 29 incident, T-Mobile "placed a padlock on its electrical disconnect switch." *Id.* Allegedly, on July 8, 2018, "T-Mobile discovered that the padlock was cut off and the electrical power was shut off again," after which T-Mobile put another padlock in place to prevent the power from being shut off in the future. *Id.* ¶ 6. During the hearing, some testimony indicated that the power had been shut off on two other occasions: July 18, 2018 and August 4, 2018. Photographs of the site, as well as other testimony, made clear that the power switches are located in a relatively unsecure area. It is unclear who shut off the power or removed the locks. Counsel for T-Mobile acknowledged that T-Mobile may need to find a better solution to secure the switches to prevent this from happening in the future.

There is some question as to whether the Letter from Mr. Telemachos threatened to interfere with the commercial-to-generator power switch. To the extent that the Letter did threaten to interfere with it or have it removed at T-Mobile's expense, T-Mobile has shown that it is entitled to a preliminary injunction preventing such interference.

T-Mobile has shown it is substantially likely to succeed on the merits of that issue; the Court sees no reason why T-Mobile should lose the ability to have a power switch that enables it to switch from commercial power to power provided by its own generator (should it decide to place one there) under the lease. If MOCCA were to remove or turn off the switch, T-Mobile would suffer immediate and irreparable harm that could not be adequately compensated by damages. The communications facility handles approximately 15,000 voice calls per day, much more data usage per day, and

around thirty emergency 911 calls every month. If the communications facility loses power, many T-Mobile customers, and potentially those in need of emergency aid, could be negatively impacted. If those people lose cell service, T-Mobile faces a loss of goodwill and customers, which has been recognized as an irreparable harm. *See BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968-70 (11th Cir. 2005).

The threat of such injury certainly outweighs any harm that the non-movant would face. Here, MOCCA would suffer no harm from simply refraining from interfering with the commercial-to-generator power switch. Finally, the entry of relief would clearly serve the public interest, as the public relies on the services provided by the T-Mobile communications facility. Accordingly, to the extent that the "generator hook-up equipment to the meter" in the Letter from Mr. Telemachos refers to the commercial-to-generator power switch located on the ground level of the premises, MOCCA will be enjoined from shutting it off or interfering with it in any way.

**IV.     T-Mobile Roof Access for Repairs to Communications Facility**

Unrebutted testimony from Timothy Flint, a field technician for T-Mobile, indicated that he was denied access to the roof to replace T-Mobile rectifiers[3] and that he was told that T-Mobile technicians would only be able to access the roof "by crane or helicopter." Counsel for MOCCA represented to the Court that, in the future, MOCCA would permit T-Mobile technicians to access the roof by elevator in order to replace the rectifiers and make other necessary repairs. Based on Counsel's representations to the Court, the issue of denial of access to the roof is moot.

---

[3] Rectifiers are part of the system that keeps the communications facility powered and, when fully operational, provides battery back-up in the event of a short-term power outage.

### V. Demands for Removal and/or Elevation of T-Mobile Equipment from Rooftop

The Letter stated that, if T-Mobile did not remove the unused equipment[4] and remove or elevate the other equipment, contractors for Kokina would "perform the work at T-Mobile's expense without guarantee of any damages." *Id.* At the hearing, Ms. Bradley testified that T-Mobile had elevated all of the equipment that it was capable of elevating at this time. She explained that the further accommodation was impeded by the presence of Sprint coaxial cables and Freon lines belonging to MOCCA, and that, once those items had been elevated or removed as appropriate, T-Mobile could proceed with complete elevation of whatever equipment remained. Shivakumar Hattangadi, the General Manager of the hotel, testified that he was unsure who the various cables belonged to or what their purpose was. While testimony from Mr. Telemachos may be able to clarify whether the Sprint cables and Freon lines are impeding further elevation of T-Mobile's cables, Mr. Telemachos is out of the country at this time and unavailable to testify. Thus, until Mr. Telemachos can testify, Ms. Bradley's testimony stands unrebutted, and T-Mobile has established that it is entitled to a preliminary injunction on this issue. Removal of T-Mobile's equipment would prevent the communications facility from functioning, and for the same reasons detailed above in Section III, MOCCA will be enjoined from having T-Mobile's equipment removed.

### VI. Conclusion

For the foregoing reasons, the Motion for Preliminary Injunction (Doc. 3) is hereby **GRANTED IN PART AND DENIED IN PART**. Based on representations made by Counsel for MOCCA, the Defendant will allow T-Mobile to access the roof by way of the elevator in order to make necessary repairs, mooting that portion of the Motion for Preliminary Injunction. The Motion

---

[4] Testimony at the hearing indicated that, while they appear to be "unused," the cables to which the Letter refers are necessary should a cable in use become damaged and require quick replacement.

for Preliminary Injunction is thus **DENIED** as moot with respect to the roof access issue. The Motion for Preliminary Injunction is otherwise **GRANTED**. The Defendant is hereby **ENJOINED** from interfering with the commercial-to-generator power switch, and from removing or interfering with T-Mobile's rooftop equipment. MOCCA shall provide notice of this Order to all of their officers, agents, servants, employees, and attorneys. This Order shall remain in effect until further order of the Court.  Since this Order will not create a risk of harm to the Defendant, no bond is required.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 9, 2018.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party